1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Jacqueline Scott Corley, Judge

4

5  JOHN LOFTON,                    )
                                   )
6           Plaintiff,             )
                                   )
7  vs.                             )    No. C 13-05665-JSC
                                   )
8  VERIZON WIRELESS (VAW) LLC,     )
                                   )
9           Defendant.             )
   _____)
10

11                                 San Francisco, California
                                   Thursday, June 4, 2015
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 2:47 - 2:59/3:11 - 4:12 = 73 MINUTES
14

15  APPEARANCES:

16  For Plaintiff:
                                   Preston Law Offices
17                                 4054 McKinney Avenue
                                   Suite 310
18                                 Dallas, Texas 75204
                              BY:  ETHAN MARK PRESTON, ESQ.
19

20  For Defendant:
                                   Carlson & Messer, LLP
21                                 5959 West Century Boulevard
                                   Suite 1214
22                                 Los Angeles, California 90045
                              BY:  CHARLES ROBERT MESSER, ESQ.
23

24            (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

1  APPEARANCES:   (Cont'd.)

2  For Defendant:
                              Munger, Tolles & Olson, LLP
3                             560 Mission Street
                              Twenty-Seventh Floor
4                             San Francisco, California
                                 94105
5                        BY:  JONATHAN HUGH BLAVIN, ESQ.

6
   Transcribed by:            Echo Reporting, Inc.
7                             Contracted Court Reporter/
                              Transcriber
8                             echoreporting@yahoo.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>Thursday, June 4, 2015</u>                              <u>2:47 p.m.</u>

                    P-R-O-C-E-E-D-I-N-G-S

                         --oOo--

            THE CLERK:  Civil Action C-13-5665, Lofton versus
Verizon.

            MR. MESSER:  Good afternoon, your Honor.  Charles
Messer for Collecto on the motion for sanctions, and for --
on the motion for sanctions, Jonathan Blavin for Verizon
Wireless, and we are both appearing on behalf of Verizon
Wireless on the motion to compel.

            THE COURT:  All right.  Good afternoon.

            MR. BLAVIN:  Good afternoon.

            MR. PRESTON:  Good afternoon, your Honor.  This is
Ethan Preston on behalf of John Lofton.

            THE COURT:  Good afternoon.

        All right.  So this, we have a motion to compel and
motion for sanctions.  Let's start with the motion to
compel, and I want to skip over for the moment the motion to
compel the documents and the -- the vendor documents, and
let's go -- start with the privilege log.  And so I guess,
Mr. Messer, has Verizon or Collecto yet produced a privilege
log?

            MR. MESSER:  I know that it's -- I don't think we
have.  It's a work in progress on Powell.  I know there's
been correspondence Henshaw (phonetic) firm to make sure

4

1  it's complete.  I would have really hoped it would be

2  completed by now.  I don't believe it has.

3          THE COURT:  All right.

4          MR. MESSER:  Mr. Preston might be able to correct

5  me on that, but that's my understanding.

6          MR. PRESTON:  I have not received anything.

7          THE COURT:  So I'm not quite sure why not, right?

8  I mean, you didn't come to the Court and ask for an

9  exception.  The Rules apply to Verizon, and he shouldn't

10 have had to file a motion to compel.

11     So with respect to the documents discussing Verizon's

12 termination of Collecto, you take the position that many of

13 those documents are privileged.  That privilege log must be

14 produced by June 19th.  All right.

15         MR. MESSER:  Will do.

16         THE COURT:  With respect to the documents

17 discussing the Powell case, for these I need to know the --

18 like with -- Powell actually was not a certified class, not

19 even for settlement purposes.

20         MR. MESSER:  No.

21         THE COURT:  So what is it that you're looking for?

22         MR. MESSER:  There are specific communications

23 that have been redacted from what was produced to us.  Their

24 settlement communications -- I don't care about the

25 settlement amounts, but the settlement communications do

5

1  discuss -- we can see, look, we searched all our account

2  records for wrong numbers.  We searched the account notes,

3  not the CDR's but the account notes.  And we had a

4  computerized search that was able to locate 40 class

5  members, which was, you know, a minimal scope of class

6  members, and that's it, and there's documents in there that

7  have been pulled out that I can't tell what's been pulled

8  out, but it's clear that the -- the results of those

9  searches have been pulled out from what was produced to us.

10  I'd also ask that the stuff is produced to us in the native

11  format.  It's not helpful to get 1,000 pages of PDF's when I

12  could get, you know, 16 E-mails.

13        THE COURT:  So with respect to Powell, you're

14  looking for communications that discuss the search for the

15  wrong numbers?

16        MR. MESSER:  Right.  There is -- there are

17  communications that specifically discuss class certification

18  and class discovery.  There's also communications between

19  Verizon and Collecto that would discuss Powell.  Now, that's

20  a different issue.

21        THE COURT:  Yes.  Let's start with communications

22  between Powell and Collecto, right.

23        MR. MESSER:  Sure.

24        THE COURT:  So -- so their communications that

25  discuss -- between Powell and Collecto, that discuss class

6

1 certification and class discovery.  And, in particular, what

2 you're interested in is the -- well, the case was about the

3 same thing, right?

4          MR. MESSER:  Yes, wrong number on the request.

5          THE COURT:  Wrong number.  All right.  So why are

6 those privileged from discovery?

7          MR. MESSER:  We asserted their privilege under

8 Rule 408 because all those discussions -- and there are not

9 very many of them -- were in the context of settlement

10 discussions.  We cited the Big Baboon case and the -- the

11 federal policy in favor of the privacy of settlement

12 negotiations and -- and for that reason, it would help --

13          THE COURT:  But what is the policy here that would

14 do that?  I mean, he's not looking to show liability.  He's

15 just trying to figure out can you get this information.  You

16 talked about whether you can get it before.  Rule 408 is a

17 rule against admissibility, not discoverability.  You know

18 that stuff is -- why shouldn't you have to produce that

19 subject to a confidential order -- confidentiality order?

20          MR. MESSER:  Because it is a well -- because,

21 again, it's -- I think Mr. Preston overstates what the

22 records say, but these were settlement discussions.  The

23 case was settled on an individual basis, and it is not -- at

24 this point it's not relevant to anything, and the Big Baboon

25 case suggests that --

7

 1          THE COURT:  How is it not relevant to anything?

 2          MR. MESSER:  Well, at this point it's not relevant

 3  because we have produced class discovery, and we can --

 4          THE COURT:  Well, that's a different -- that's a

 5  different matter.  How many documents are we talking about?

 6          MR. MESSER:  The total E-mail between Plaintiff's

 7  counsel and Collecto in the Powell case is fewer than 100.

 8          THE COURT:  Yeah, and I'm just talking about

 9  communications that address discovering this wrong number

10  information.

11          MR. MESSER:  It's probably 10 if that.

12          THE COURT:  Ten?  All right.

13          MR. MESSER:  Or fewer.

14          THE COURT:  Just submit it to me in camera.  I'll

15  review it --

16          MR. MESSER:  We'll do.

17          THE COURT:  -- and then I'll say if you need to

18  produce it.  But if it's relevant, then I'm -- Rules 408 is

19  a rule of -- it's different --

20          MR. MESSER:  Sure.

21          THE COURT:  -- if it's a communication -- because

22  I do a lot of these.

23          MR. MESSER:  Right.

24          THE COURT:  If it's a communication in a

25  settlement conference, those things are absolutely

8

1  privileged.  That's not what this is, right?

2          MR. MESSER:  Right.

3          THE COURT:  Okay.

4          MR. MESSER:  And is June 19th a good date, same

5  date, 15 days?

6          THE COURT:  Yeah, same date.

7          MR. MESSER:  Okay.  Will do.

8          THE COURT:  Now, is there anything else then that

9  you need a log for with respect to Powell or are those the

10 documents that you're looking for?

11         MR. PRESTON:  Those -- that is primarily the

12 documents.  There's also some concern that Verizon knew

13 about Powell.  When did Verizon know about Powell?

14         THE COURT:  Okay.  That goes to the --

15         MR. PRESTON:  No, those are responsive to this.

16         THE COURT:  To the privilege log issue?  I'm

17 addressing the --

18         MR. PRESTON:  Well, no.  It's -- if the -- the

19 privilege log will disclose --

20         THE COURT:  That's your sanctions motion, isn't

21 it?  Isn't that the question?  With your sanctions motion

22 you --

23         MR. PRESTON:  It's relevant to the sanctions, but

24 it's -- it's responsive to the motion to compel.  I mean, I

25 think we're -- it's correctly raised here.

1        THE COURT:  But how is it -- how --

2        MR. PRESTON:  You're asking me --

3        THE COURT:  How is it relevant to the case in

4   terms of proving the merits of the case?

5        MR. PRESTON:  If your Honor wants to deal with it

6   at a separate time, that's fine.

7        THE COURT:  All right.

8        MR. PRESTON:  But it's -- it is relevant to the

9   sanctions issue.

10        THE COURT:  Right.  Okay.

11        MR. PRESTON:  That's where it would arise.

12        THE COURT:  Right.  Okay.  All right.  That's what

13   I had in my notes.

14        All right.  So when you -- when you produce those

15   documents to me on June 19th, make sure at the same time you

16   produce a privilege log for all the documents you're giving

17   me to the Plaintiff as well, since you're claiming that

18   they're privileged from --

19        MR. MESSER:  Right.  I will do that.  I will do

20   that.

21        THE COURT:  Okay.  All right.  Now, let's see, now

22   there are also communications between Collecto and Verizon,

23   and what is it there, Mr. Preston, that you're seeking or is

24   it really these other documents that you want between Powell

25   and --

10

1        MR. PRESTON:  There's a lot of communications

2   between Collecto and Verizon, and some of them aren't even

3   relevant to this case.  There is a request to RPD 63 -- no,

4   64 that covers all of Verizon's communications with -- with

5   the vendors about this case.

6        THE COURT:  Right, but we're putting aside the

7   other vendors.  For right now let's just talk about

8   Collecto.

9        MR. PRESTON:  That's more complicated actually

10  because they share counsel.

11       THE COURT:  Right.  No, and they say -- so I guess

12  my question really is I should be more precise because I'm

13  back to the privilege log, which is you also asked with

14  respect to Powell.  I'm talking about the Powell case now.

15  Communications between Collecto and Verizon.

16       MR. PRESTON:  Okay.  Yeah, and we're back to that,

17  yes.  That's where I -- I suspect that could be handled

18  pretty cleanly with just a very short privilege log.  It

19  doesn't sound like there's a whole ton of communications

20  there.

21       THE COURT:  All right.  So why -- so June 19th,

22  same thing, the privilege log.

23       MR. MESSER:  We could, your Honor, but on that

24  what we've said is that they all postdate -- and I learned

25  of the Powell case during the 30(b)(6) deposition when

11

1 Plaintiff's counsel produced answers -- Collecto's answers

2 to interrogatories on that case, and that was October 15 of

3 last year.  That's when I first heard about it.  And all the

4 communications that I know of between what's either Collecto

5 or Powell, through my firm, from my law firm, were all after

6 that.

7     So -- and there -- and there are a few.  But, I mean, I

8 think these are clearly --

9         THE COURT:  No, no, no.  Those wouldn't be

10 relevant.

11         MR. MESSER:  Right.

12         THE COURT:  What we're looking for is at the time,

13 right, at the time of the Powell case?

14         MR. PRESTON:  I just want a privilege log.  It

15 doesn't have to be complicated.  It doesn't have to be

16 onerous.  And if it's the case that they -- there is a

17 written certification, look, all these postdate this day,

18 you know, I can deal with that.  That's -- that's a category

19 that --

20         THE COURT:  You just want it to be represented?

21         MR. PRESTON:  Yes, I want a certification.

22         THE COURT:  Right.

23         MR. MESSER:  And I can do that because I can

24 assure the Court that there are no pre-October 15, 2014

25 communications between the companies about the Powell case.

12

1          THE COURT:  All right.  But what you said --

2          MR. PRESTON:  That you know of.

3          THE COURT:  -- was that you know of, that your law

4   firm's aware of.

5          MR. MESSER:  Well, that's true.

6          THE COURT:  You need to go back to your client,

7   because the representation that you'll be making to Mr.

8   Preston will not be on your behalf.  It will be on behalf of

9   your client.

10         MR. MESSER:  Okay.

11         THE COURT:  And if it's inaccurate, it will be

12  your client that was inaccurate.  So you need to go back and

13  check.

14         MR. MESSER:  I will do that.

15         THE COURT:  Okay.  All right.  So the same thing.

16  And if there are communications -- or so whatever that

17  privilege log would be, what Mr. Preston is saying and I

18  agree with this, if they're all after the end of that case,

19  then just identify that.  If there are any before, right,

20  during, around the time of the settlement, then you should

21  put those on the privilege log as well.

22         MR. MESSER:  Will do.

23         MR. PRESTON:  Any that predate the November

24  deposition of Mr. Madden.

25         THE COURT:  All right.

13

1      MR. PRESTON:  I think that's what we need the

2  detailed privilege log for.

3      THE COURT:  Okay.  That will be the date cutoff.

4  Okay.  Before we go back, I have to go back and do a

5  criminal matter.  So we're going to take a few minute break.

6      (Proceedings recessed briefly.)

7      THE COURT:  All right.  So where were we?

8      MR. PRESTON:  The Powell communications.

9      THE COURT:  Right.  So I think we decided -- we

10  figured all of that out.  You were going to give them -- by

11  the 19th, again, to the extent there are any -- well, you're

12  going to certify that all communications are after whatever

13  that November date is, and to the extent -- or, I mean

14  before that date you'll put them on the privilege log.

15      MR. PRESTON:  Yes.

16      THE COURT:  Okay, all right.  So I think that has

17  to do with the privilege log.

18    Now, the request for admissions.  Some of those ask for

19  whether Verizon knew it could produce a list of outgoing

20  calls.  Or, I think maybe the request actually asks for

21  whether Verizon's counsel -- but that's not a relevant

22  inquiry.  The question is whether Verizon -- because if

23  Verizon's counsel knew, Verizon knew, because they're

24  agents.  So the question is whether Verizon knew.  And,

25  again, I want to focus just on Collecto now, with respect to

14

1  the Collecto documents.

2     So why can't you answer that question?  That's just a

3  factual question.  There's nothing privileged being sought

4  in that request for admission.  Now, in terms of privilege,

5  I mean why shouldn't you answer that question?  Whatever the

6  answer may be?

7          MR. BLAVIN:  Well the question was, I believe,

8  directed at Collecto's counsel.

9          THE COURT:  Okay, so let's scratch counsel.  I

10  understand why that's objectionable.

11          MR. BLAVIN:  Okay, so if there are different

12  requests, you know, well then we can respond to those, but

13  we were responding to the requests as they were written to

14  us, and we agree -- what I know or when I know it is not

15  relevant to anything, I don't think.

16          THE COURT:  Well it is relevant, I suppose, to

17  some of the discovery and whether it is identifiable in all

18  of that.  So there's a long history in this case.

19     So I'm going to construe, and you can construe, and you

20  can cross out counsel in those requests for admissions.  And

21  then I want you to answer them.  The one's asking whether

22  Verizon knew -- I think it's 2012, 13 or 14, whatever it was

23  -- answer those by June 19th.

24          MR. PRESTON:  Your Honor, there are -- the RFAs

25  directly asked what -- there's a set that ask directly for

15

1  Verizon, and there's a set that asks Verizon counsel.

2          THE COURT:  Right.  I don't know why it's relevant
3  to Verizon counsel.  Right.  That's what I'm --

4          MR. PRESTON:  Allocation of sanctions.

5          THE COURT:  Well we don't do discovery for that
6  reason.  So you can do it as to Verizon.

7          MR. BLAVIN:  Okay.

8          THE COURT:  So answer the RFAs as to Verizon, with
9  respect to Collecto.

10         MR. BLAVIN:  Right.

11         THE COURT:  Collecto, whether they could produce a
12  list of the outgoing calls.

13      All right, so then we have requests for productions 53
14  and 54.

15                  "All documents which are referenced

16                  in any disclosure by Verizon under Rule

17                  26(a)1."

18  That's Mr. Messer.  I said the number and you stood up.  You
19  know the number.

20         MR. MESSER:  Well, you know, we give a division of
21  labor here.

22      Yes, we have fully complied with Rule 26 and we
23  complied again.  Discovery is open and we produced an expert
24  report yesterday and advised Plaintiff's counsel that it's
25  their obligation to produce that under Rule 26 in hope of

16

1 getting a supplemental -- another supplemental Rule 26

2 disclosure on the expert report.

3       THE COURT:  Well, so with respect to these, what

4 he says he wants to know, because there's been a bit of

5 ambiguity, is just that you two supplement your response to

6 say that you have now produced all responsive documents.

7       MR. MESSER:  Well we have to date, sure.  But as I

8 said, we had a new document yesterday, a new report.  So

9 discovery is open and it's ongoing.  Sure.

10       THE COURT:  Right.  But up to now, everything that

11 you're aware of, you -- just supplementing.

12       MR. MESSER:  Yes.

13       THE COURT:  Can you just supplement -- again, by

14 June 19th, okay?

15       MR. MESSER:  Okay.

16       THE COURT:  All right.  Now, request number 56

17 seeks the document named "Verizon Bad Phone Search-CSV."

18 And you actually didn't respond to that one in the motion.

19 So why -- it sounds like -- right on point.  Why shouldn't

20 you produce that document?

21       MR. MESSER:  I don't know what that document is,

22 your Honor.  I apologize.

23       THE COURT:  It's in their -- yes.  It's in their

24 brief and it's in their motion to compel.

25       MR. PRESTON:  It's a document that was prepared by

17

1   Ryan Grimes when they were looking for wrong numbers during

2   the -- when they were preparing the accounting notes.

3           THE COURT:  All right.  Well, I'm going to order

4   that document produced by June 19th.

5           MR. MESSER:  Okay.  That's request 56?

6           THE COURT:  Fifty-six, correct.

7           MR. MESSER:  Thank you.

8           THE COURT:  All right.  Now I think next we have

9   request 60.  So that, Mr. Preston, I'm not -- I don't quite

10  know what you're seeking there.

11          MR. PRESTON:  Give me two seconds so I can look at

12  the actual response, because I know what the problem is.  I

13  think the issue is not we're actually looking for -- it's on

14  the response.  It's not on the actual looking for new

15  documents.  It's a defensive, you know, what are your

16  defenses.

17      Based -- their initial responses are a whole bunch of

18  objections which are not meritorious.

19          THE COURT:  But what is it that you're looking

20  for?  I understand.  So they're taking the position that the

21  cellular telephone carrier doesn't know where the call is

22  received?

23          MR. PRESTON:  Right.  If they -- if they have

24  evidence beyond what's in their cell towers that other cell

25  carriers can't identify class members or where the class

18

1   member was at the time they received the call, if there is

2   some specific document that's going to pop up in an

3   opposition to a motion for class certification, they should

4   produce that now so my expert can look at it now, not later.

5           THE COURT:  All right.  Do you have any such

6   document?  I mean, carriers can.  I know.  They do it all

7   the time.  That's what the whole -- there's a whole big

8   controversy out there as to whether you should require a

9   warrant, whether or not in terms of law enforcement because

10  law enforcement uses that information all the time.  How

11  easy it is to get I don't know.

12          MR. MESSER:  Verizon Wireless keeps tower data for

13  90 days, which is what we said.  We did produce a record in

14  discovery that said that some -- it had to do with the

15  number of California area code cell phone numbers that had

16  out-of-state billing addresses, and so that's been produced.

17  And so right now that's a document that we're relying on,

18  and if we discover more documents -- and I don't know of any

19  other documents, but if we discovery any other documents, I

20  think those may need to be disclosed under Rule 26, but I

21  don't know of any other records.  So that right now on that

22  topic, that's the document that we rely on.

23          MR. PRESTON:  I'm happy to let that rest if

24  there's a certification.

25          THE COURT:  All right.  I guess just amend your

19

1  response to say to response number 60 that you've produced

2  all responsive documents of which you are currently aware,

3  right.  I guess the confusion is because when you do all the

4  objections, then they don't know if there are documents that

5  are being withheld.  So they just want you to -- you know,

6  right, you always say "Notwithstanding these objections,

7  we've produced all responsive documents."

8         MR. PRESTON:  Yeah, there's a -- for the record,

9  the Heller case is very nice and deals with that, but, for

10 the record, there's going to be a change in the rules come

11 November, you can't do that anymore, and it makes it very

12 explicit.  If you are withholding documents based on an

13 objection, you need to tell us.  So we're -- this business

14 about, oh, without waiving our objections, here are the

15 documents --

16        THE COURT:  Right.

17        MR. PRESTON:  -- and you don't say what's been

18 withheld.

19        THE COURT:  Well, so they will supplement RFP 60

20 to represent that they've produced all responsive documents

21 and are not withholding any documents.

22        MR. PRESTON:  Great.

23        THE COURT:  By June 19th.

24        All right.  Is there anything with respect to the

25 RFP's then, with respect to Collecto's side?  I think that

20

1  covers it, right, all those numbers?  On the motion to

2  compel.

3       So now with respect to the big issue, which is the

4  motion to compel the documents from the vendors, and what's

5  happened in the meantime is that Judge Gonzalez-Rogers

6  denied in part and granted in part their motion to dismiss.

7  She denied it with respect to she said that the Plaintiff,

8  Mr. Lofton, has standing to assert claims on behalf of those

9  putative class members who may have received a call from

10 these other vendors, but she said you haven't alleged facts

11 to -- sufficient to plausibly allege that these other

12 vendors did what you've alleged Collecto has done, and she

13 dismissed that and gave you leave to amend.

14      That complaint has now been filed, and there's now a

15 briefing schedule in place.  Now, she also specifically said

16 you don't get any discovery with respect to those vendors

17 and what they did.

18           MR. PRESTON:  Until --

19           THE COURT:  Yes?

20           MR. PRESTON:  Until the complaint is filed.

21           THE COURT:  Yes.

22           MR. PRESTON:  The complaint is filed.

23           THE COURT:  Mr. Preston, I understand.

24           MR. PRESTON:  All right.

25           THE COURT:  But -- but the point is what's --

1 what's the difference?  If she's going to grant the motion

2 to dismiss and we go through all this --

3          MR. PRESTON:  And there's an efficiency argument,

4 and that's I'm sensitive to.

5          THE COURT:  Oh.

6          MR. PRESTON:  Let's also remember there's the IPA

7 claim.  They're making kind of this Twombly argument of you

8 can't allege, you know, an ATVS, and that's what it was

9 dismissed on, and it was this kind of -- you know, you need

10 to allege information, and so, of course, we dumped

11 information on -- but we've also got the IKA claim out

12 there.  That's still alive.  That's still valid, and that's

13 still going --

14          THE COURT:  The privacy claim?

15          MR. PRESTON:  -- for all the people.

16          THE COURT:  And the privacy claim is that they

17 recorded the calls without their permission?

18          MR. PRESTON:  Correct.

19          THE COURT:  All right.

20          MR. PRESTON:  And it requires all the same --

21          THE COURT:  Well --

22          MR. PRESTON:  -- most of the same evidence.

23          THE COURT:  -- first we need to decide if they

24 recorded the claims without their permission, right?  That

25 -- that -- because if they didn't, you don't need any of

22

those other things.

          MR. PRESTON:  You -- you need to look at wrong number call logs.

          THE COURT:  Well, you need to know if they recorded the calls.

          MR. PRESTON:  That's --

          THE COURT:  If they recorded the calls --

          MR. PRESTON:  I'll tell you that there is a -- you know, a standard policy that applied to all those.

          MR. BLAVIN:  Your Honor, if I may speak briefly on that -- that issue, the specific issue of the IPA claims. Earlier in this litigation there was substantial discussion between us and Plaintiffs relating to which vendors may have followed Verizon's policy, may have not followed Verizon's policy, may have recorded calls, may have not recorded calls.

    If the discovery is going to be narrowly focused on which vendors for which there are particular requests for production, RFA's, interrogatories that are specifically relevant to the IPA claims, we're happy to meet and confer with Plaintiffs about that, but the discovery that currently exists is much more expansive than that.  It encompasses vendors which have already told us, which we've communicated to Plaintiffs, that they may not have used Verizon's disclosure message and that they may not have recorded

23

1 calls.  So I think we need to substantially narrow the scope
2 of discovery.  And, again, we're happy to meet and confer
3 with Plaintiffs about that if he's claiming that discovery
4 should go forward specifically to the IPA claims.
5           THE COURT:  Well, that's what -- that's what
6 he's --
7           MR. PRESTON:  It overlaps almost entirely.  In
8 fact, the IPA is just -- you still need to look at the wrong
9 number call logs.
10           THE COURT:  You do.  If --
11           MR. PRESTON:  Yes.
12           THE COURT:  If those calls were recorded.
13           MR. PRESTON:  Sure.  And --
14           THE COURT:  If they weren't recorded, you don't
15 need to look at them.  So the first step is if they were
16 recorded.
17           MR. PRESTON:  Yeah, and there is this -- this is
18 back in I want to say -- this is early 2013 there were some
19 declarations I'm now remembering, but I know for sure that
20 we were still looking at two of the other vendors, which
21 were Vantage and VKI.  And I -- I don't know what happened
22 with the other vendors.  So it's -- this is not moot.
23           THE COURT:  Right.  So Mr. Blavin, is that right?
24           MR. BLAVIN:  Yes, that's correct, your Honor.
25           THE COURT:  How do you propose we resolve whether

24

1  these vendors who are part of the not named Defendants but

2  part of the IPA claim which you have not moved to dismiss,

3  whether they recorded these calls or not?  How are we going

4  to resolve that?

5          MR. BLAVIN:  I think that we've already provided

6  declarations from some of the vendors who've agreed to

7  participate and provide us with that information relating to

8  whether or not they've recorded the calls.  If Vantage and

9  VKI are outstanding, we can go back to them and try to get

10 the facts as we know them and report back to Plaintiffs.

11         THE COURT:  Okay.  I don't understand how you

12 can't get that, because if they're -- if you -- if part of

13 your agreement with them is that they -- they have to comply

14 with your policies, which is they not violate the law and

15 leave you vulnerable to these lawsuits, I can't imagine that

16 they could withhold from you whether they've recorded these

17 calls or not and cooperate.  And if they do, what I would

18 expect Verizon to do is to terminate their contract with

19 them, right, because they're not --

20         MR. BLAVIN:  Your Honor, and we are not asserting

21 that the audit provision would preclude the discovery of

22 that information.

23         THE COURT:  Okay.

24         MR. BLAVIN:  And I want to be clear I'm not taking

25 that position.

25

1          THE COURT:  All right.

2          MR. BLAVIN:  And we will go back to them.  I just

3 need to look back to see whether or not, you know, to the

4 extent that they provided us with that information and what

5 it is, and then we can report to Plaintiffs on that.

6          THE COURT:  All right.  So by June 19th I want you

7 to provide them with that evidence, whether it be

8 identifying the declarations previously submitted in writing

9 about --

10          MR. PRESTON:  Okay.

11          THE COURT:  -- about whether they were recording

12 them or not.  So then if they were recording them, then that

13 means that other evidence then would be relevant.

14          MR. BLAVIN:  Yeah, and I would -- I would just

15 make clear that if they were recording them and also

16 providing the disclosure, which Plaintiffs allege is in

17 violation of the law, if they are providing the disclosure,

18 which I know happened with some of the other vendors, they

19 were providing their own disclosure in which Plaintiffs have

20 said, "Okay, we're not going to challenge that."  So I just

21 want to make clear that we will confirm those two pieces of

22 evidence -- information.

23          MR. PRESTON:  We do need to meet and confer on

24 that because I'm -- I'm sorry.  I'm just a little vague and

25 hazy on -- this is all back in --

26

1          MR. BLAVIN:  No, it's a while ago.

2          MR. PRESTON:  Yeah.  I forget who fell out of

3  what.

4          THE COURT:  Okay.  All right.  So it seems then

5  with respect to that that you should meet and confer, and it

6  sounds like -- you're standing up there for Verizon now?

7          MR. BLAVIN:  Yes, that's correct.

8          THE COURT:  -- that Verizon is saying that they

9  will, you know, work with the vendors and get that

10  information to you.

11          MR. BLAVIN:  Correct.

12          THE COURT:  Okay.  And then what?  Then what

13  happens on June 19th when you provide that to Mr. Preston?

14          MR. BLAVIN:  Well, to the extent he wants to move

15  forward and assert his other requests for production which

16  seek a variety of information beyond that, I think there is

17  an issue as to whether or not that information is within

18  Verizon's control, and this is the issue that was -- your

19  Honor previously resolved with respect to RFP's 49 and 50,

20  but now it goes beyond that because they are, you know,

21  seeking expansive call log information from the vendors,

22  several of whom, as we've repeatedly informed the Court,

23  have flat out refused to provide it to us, say it does not

24  fall within the scope of the order.

25          THE COURT:  Why don't you terminate the agreements

27

1  then with them?

2         MR. BLAVIN:  Well, your Honor, frankly, we don't

3  -- ourselves don't believe that that kind of information

4  falls within the scope of the audit provision.

5         THE COURT:  All right.  That's fine.  So let me

6  ask you this, Mr. Preston.  So we could go this, right, and

7  go through this layer of having to -- and I've seen in other

8  cases where the third party trying to get the documents is a

9  foreign party, and so you have to go through the Hague

10  Convention or something that makes sense.  They're there.

11  Why don't in the meantime you serve them with a subpoena.

12         MR. PRESTON:  Okay.

13         THE COURT:  And then I can get them -- as opposed

14  to Mr. Blavin, I can get them standing here, right, as

15  opposed to doing this telephone thing.

16         MR. PRESTON:  Sure.  And there's a couple of

17  issues.  The first issue is we're real confident.  We did --

18  we did serve them with subpoenas.  We've gotten back all

19  objections.

20         THE COURT:  Yes.  And that's when you move to

21  compel.  I mean, that's what you're going to get -- that's

22  what you're getting here.  It's no different.

23         MR. PRESTON:  Yeah, but I'm dealing with one

24  Defendant who's properly before the judge.

25         THE COURT:  Yeah.

28

1          MR. PRESTON:  By the way, if I have to serve and

2 litigate on all the other motions, the subpoenas, the way

3 Rule 45 is set up, I have to go and --

4          THE COURT:  They're not here.

5          MR. PRESTON:  Not here.

6          THE COURT:  They're not --

7          MR. PRESTON:  Unless they waive them, unless they

8 waive venue, and I'm happy to ask if they'll waive venue.

9          THE COURT:  Well, maybe Mr. Blavin should ask

10 that.

11          MR. PRESTON:  I think that should --

12          MR. BLAVIN:  I could get that message to them.

13 And I -- I think some may be located in California.  No?

14          MR. PRESTON:  No.

15          THE COURT:  Well, it has to be in the Northern

16 District.

17          MR. BLAVIN:  The Norther District.

18          MR. PRESTON:  And it's --

19          THE COURT:  Well, that's -- I understand that.  I

20 understand that.

21          MR. PRESTON:  So, in terms of efficiency, I have

22 one Defendant who the contracts are clear.

23          THE COURT:  No, no, I understand that, but there

24 is this hurdle that you have -- with respect to the

25 subpoenas that you wouldn't have to get over, which is the

29

possession, custody, or control.  You got over it with

request 49 and 50.  You may get over it here.  I was just

thinking you don't even have to address it if you have those

parties directly in front of you.

MR. PRESTON:  I have a choice between dealing with

it here, the custody -- the control issue, either I deal

with it here with one Defendant or I deal with it -- under

Rule 45, you know, the place of production was properly put

elsewhere around the country.  It's five different venues.

I'm not really interested in -- I'd prefer to do that -- I

prefer the first before I go to the second.

MR. BLAVIN:  And, your Honor, just briefly, I

mean, what you're proposing is exactly what the Court in the

Zewdu (phonetic) case did, which we cite in our papers from

the Northern District.  I believe that was Magistrate Judge

James, and that's Z-E-W-D-U, you know, said, you know, "This

custody and control issue is really complicated.  Why don't

we just serve a Rule 45 subpoena?"  The Defendants in that

case said "We will not object to that subpoena."  Verizon

here is not going to object to those subpoenas being served.

We haven't objected to those subpoenas being served.  It's

obviously an easier way for them to get discovery than to

require Verizon to initiate litigation against these other

vendors which the Plaintiffs have --

THE COURT:  Well, who says you have to initiate

30

1 litigation?  I'll bet if you said if you don't comply with

2 this and let us see these documents that we are now being

3 held liable for your conduct, that we will no longer use you

4 as our vendor, that you wouldn't have to sue them.

5        MR. BLAVIN:  Well, possibly.  But, your Honor, I

6 also would suggest that that would be an unprecedented step

7 for the Court to require Verizon to threaten to terminate

8 its economic relationships with these vendors when they have

9 asserted objections based upon a contractual reading that we

10 don't find objectionable.  In fact, we agree with it with

11 respect to the scope of the audit provision.

12     So for us to say we're going to terminate your

13 relationship in case you don't produce these documents, I

14 haven't seen any court which is authorized and required a

15 party to terminate relationships pending discovery to third

16 party documents.

17        THE COURT:  You may not have to do it, but you may

18 be held in contempt of the Court if you don't follow a

19 lawful order of the Court.

20        MR. BLAVIN:  I understand, your Honor.

21        THE COURT:  Do you see what I'm saying?

22        MR. BLAVIN:  I understand.

23        THE COURT:  And you have your remedies.  Well, I

24 think the thing to do is you provide it to them -- and now

25 we're talking about the IPA claim only, and then I think

1  what I need then is -- is for it -- because I don't think I

2  can say just because I did hold it with respect to the other

3  documents, although I certainly indicated -- and I still

4  indicate today I'm not sure I agree with your reading of

5  those contracts.  I mean, it says unrestricted access, and I

6  read your brief.  This is not that persuasive.

7            MR. BLAVIN:  I mean, I can respond to that now or

8  we can defer that discussion until later.

9            THE COURT:  Yes, because I want it to be very

10  precise then, the argument as opposed to all these pages,

11  right.

12            MR. BLAVIN:  I understand.

13            THE COURT:  With this is why the call detail logs,

14  right?  That's what you're going to be searching.  What --

15  what do you think you're going to -- you want?

16            MR. PRESTON:  So there are two -- we're talking

17  about class discovery.  There's three discovery requests.

18  There's Interrogatory 21, RPD 48, which are both call logs,

19  and then RPD 45, which is the actual recordings themselves.

20            THE COURT:  All right.  So let's start with the

21  recordings.

22            MR. PRESTON:  And they can't find the recordings

23  without the call logs.  All right.  It's going to be real

24  burdensome for them to find the recordings before they get

25  the call logs.

32

1          THE COURT:  Well, that's a different matter,

2   production versus findings.  So are you saying to me that

3   Verizon, who hired let's say Vantage, to make these calls on

4   their behalf, Verizon who could be held liable, what if

5   they're screaming and yelling and threatening people, you're

6   saying "We have no right to require them to provide us with

7   those recordings?"

8          MR. BLAVIN:  Well, with respect to recordings that

9   were made in the context of Verizon's specific account,

10  sure.  You know, the issue here is what he's seeking is call

11  log information relating to calls that were made to wrong

12  numbers, okay, not Verizon customers at all.  So wrong

13  numbers --

14         THE COURT:  Well, they thought they were calling

15  Verizon's customers.  They were maybe wrong call numbers on

16  Verizon's behalf as Verizon's agent.

17         MR. BLAVIN:  They did, and that -- but that agency

18  relationship does not confer a right under the agreement to

19  authorize Verizon to go into their systems and extract

20  enormous amounts of data.  If you look at the specific audit

21  provisions at issue -- and your Honor I think was focusing

22  on the technological system setup provision that says -- and

23  that's paragraph seven of Exhibit A, and I think your Honor

24  is focusing on the language that says:

25                   "Verizon's access to all

1              information in contractor's possession

2              or control regarding Verizon accounts

3              being handled for collection by

4              contractors to be completely

5              unrestricted."

6         I think that's the language your Honor was referring

7    to.

8              THE COURT:  Uh-huh.

9              MR. BLAVIN:  If you look in the context of that

10   paragraph, what it's specifically referring to is giving

11   Verizon access sufficient to allow Verizon to monitor the

12   current status of all accounts referred to contractor by

13   Verizon for collection, both in summary form and by

14   individual account.

15        I just don't think that that provision at all

16   contemplates the kind of discovery they're seeking.  They're

17   seeking information with respect to calls that were not even

18   relating to the collection of accounts for specific Verizon

19   customers.

20             THE COURT:  They were relating to it.  They were

21   mistaken.  They made the call because they were attempting

22   to collect a call -- I mean, to collect on a debt for

23   Verizon.  That's -- that argument is too cute by half.  That

24   -- that -- so -- so, just to be clear, you're saying that if

25   it was a call to a Verizon customer, we could demand a

34

1    recording, but because they made the call and it turned out

2    it wasn't a Verizon customer, even though it was a call made

3    exactly on Verizon's behalf, we can't demand the recording.

4    Is that the argument?

5            MR. BLAVIN:  Well, and in the context of

6    proportionality as to what you're seeking to --

7            THE COURT:  No, no, no.  No.  Your argument, not

8    proportionality, was that you under the contract do not have

9    the right to demand it.  So let's be precise.  Are you

10   saying if it was a call that actually -- the call was to a

11   Verizon customer, they had the right number, you could

12   demand a recording?

13           MR. BLAVIN:  With respect to the recordings, yes.

14           THE COURT:  Okay.

15           MR. BLAVIN:  And I'm fine with that, and even if

16   they could identify a single call and say "This is a call we

17   need to identify the recording," but what they're seeking

18   here is something far beyond that, your Honor, and that's

19   why we think you need to consider the proportionality of --

20           THE COURT:  Okay.  We'll get there, because your

21   argument wasn't proportionality a few minutes ago.  It was

22   the we have no right to seek these documents at all.  I'm

23   focusing on the contract language.  Don't switch on me.

24   Stay with it.  If you have to give on it, you do.  Then you

25   can argue proportionality, but stick with this argument.

1    Now, now what I'm asking -- so you'd say that.  Now, is

2  it your position that even though you admit you could demand

3  the recordings, if the -- if the same vendor is making a

4  call on Verizon's behalf seeking that Verizon customer but

5  they get a wrong number, they can't demand that recording?

6         MR. BLAVIN:  I don't think the contractor

7  authorizes that, but, again, I would say that I think you

8  also need to consider the scope of the calls at issue,

9  because that ties into whether it makes sense in the context

10 of this provision, which is talking about generally finding

11 the current status of accounts for collection.

12    What they are seeking is not just give us this

13 recording made from this call.  They're saying go back to

14 these vendors, ask them to produce enormous files.

15         THE COURT:  Okay.  That's proportionality.

16         MR. BLAVIN:  Right, but it ties in to how you read

17 the agreements and whether it makes sense in the context of

18 this provision that all of the information they're seeking

19 is authorized under the contract.

20         THE COURT:  What makes sense under the contract is

21 that when Verizon is sued for the conduct of its vendors,

22 that Verizon would have ensured that it had the right to get

23 the documents or things that it would need to defend itself,

24 that it would have the right to find out if its vendors are,

25 in fact, violating the law and making Verizon vulnerable to

36

1  suit.  That is what makes sense, and I find it hard to

2  believe, especially when you look at that language, that

3  somehow it means Verizon can only find out about specific

4  accounts but can't do anything to ensure that its vendors

5  are complying with the law and not making Verizon liable to

6  suit.

7         MR. BLAVIN:  I'm not saying that we don't have the

8  ability to make sure that our -- our vendors are complying

9  with the requirements of the law.  Of course we do.  And

10  that's why we had no problem and our vendors had no problem

11  with respect to producing documents in response to RFP 49

12  and 50, which is are you using -- you know, produce the

13  manuals with respect to the callers.  Are you using, you

14  know, auto dialer machines which could be in violation of

15  the TCPA.  And those documents were produced.

16      What's sought here is something far different.  It's

17  seeking this expansive dialogue, call log information, and

18  it's seeking beyond that all of the recordings relating to

19  it for non-Verizon customer calls, and I think that does go

20  far beyond to ensure that your vendors are complying with

21  the law.  But --

22         THE COURT:  I'm not sure about that, and I

23  certainly don't have any declaration in front of me with

24  respect to proportionality about what it would require or

25  any of that, do I?

1          MR. BLAVIN:  Well, what you have in front of you,

2    your Honor, on proportionality is the fact that we've asked

3    for these, you know, documents from the other vendors, and

4    they've said no.  They haven't cooperated.  We've had --

5          THE COURT:  So what?  So I should just say "Oh,

6    they won't cooperate.  Therefore, the contract and all that

7    doesn't mean anything?"  What case says that?

8          MR. BLAVIN:  Well, your Honor before said that

9    proportionality is relevant even with respect to these audit

10   provisions because the alternatives, which Mr. Preston is

11   asserting is that we have to either sue them or terminate

12   the contract with them, and I think that that goes well

13   beyond proportionality principles when Mr. Preston could

14   just go serve them with a Rule 45 subpoena which would avoid

15   all of this.

16         THE COURT:  All right.  Will you get them to agree

17   that the subpoena could be enforced in this District?

18         MR. BLAVIN:  We will bring that to them, and we

19   will -- we will certainly request that, and we will -- we

20   will assert whatever pressure that we have in --

21         THE COURT:  I mean, if that's what you want.  If

22   that's what you want, because, actually, I think what Mr.

23   Preston is saying makes some sense.  For him to have to go

24   to five different jurisdictions and five different judges,

25   that doesn't make a lot of sense.

38

1        Now, there is a procedure for having it transferred

2   here, but --

3              MR. PRESTON:  That's still five different

4   districts.

5              THE COURT:  No, I understand that.

6              MR. BLAVIN:  Yeah, and Mr. Messer was just

7   reminding me that when they were served with a Rule 45

8   subpoena, VK and Sunrise, they filed motions to quash in

9   this District.  They did not file motions to quash in other

10  districts themselves.

11             THE COURT:  No.

12             MR. PRESTON:  Which doesn't -- and I fight the

13  motion to quash here, and I say, "Oh, you should -- you

14  should comply with the subpoena after you lose on the motion

15  to quash," and they say "No, no, no, Mr. Preston.  You need

16  to file the motion to compel in this foreign district."

17             THE COURT:  No, Mr. Preston.  When I deny the

18  motion to cross, I order them to -- to comply.

19             MR. PRESTON:  Is your Honor sure she has the

20  authority to do that unless they waive venue?

21             THE COURT:  Yeah, I am.  They've waived the venue

22  by bringing the motion to quash here.

23             MR. PRESTON:  Then that's fantastic, and I'm happy

24  to hear it.  That would be great.

25             THE COURT:  Because, you know, so when I clerked

1  right out of law school, I clerked for Judge Keaton, and he

2  used to say -- he's -- he used to say "The law is a

3  beautiful thing, and I will not interpret it in a way that

4  doesn't make any sense."  And so to -- to hold to the

5  contrary in that context would not make any sense

6  whatsoever.  So I'm confident that if they bring the motion

7  to quash the subpoena here and I deny it and I order them to

8  comply, that I could do that.

9         MR. PRESTON:  Your Honor, forgive me.  I've been

10  dealing a lot with arguments that haven't made a whole lot

11  of sense.

12     There is one thing that I wanted to turn your Honor's

13  attention back to.  Mr. Blavin said "Look, the vendors have

14  refused."  There's no admissible evidence that the vendors

15  have refused.

16         MR. BLAVIN:  And his argument is that there's no

17  declarations from the vendors saying we refuse to produce,

18  we refuse to cooperate, and we have asked the vendors

19  repeatedly to make appearances here to state their position,

20  and they have said no.

21         THE COURT:  Yeah, but there's no -- there aren't

22  any declarations as to what you've done really.  I mean, you

23  say vaguely, but there isn't "Here's a copy of the letter.

24  Here's our in-house counsel."  I mean, there is something

25  about what -- you know, but this is what I want you to do.

40

1          MR. BLAVIN:  Uh-huh.

2          THE COURT:  We've agreed with respect to the IPA

3     claims that you by June 19th will identify so we can figure

4     out what vendors we're talking about, right?

5          MR. BLAVIN:  Yes.

6          THE COURT:  All right.  Then some of these vendors

7     you already -- at least one or two of them you participated

8     in a call with, right?

9          MR. BLAVIN:  VI and Sunrise, who they served a

10    subpoena on.

11         MR. PRESTON:  Well, we served subpoenas on all

12    five of the other vendors.

13         THE COURT:  Well, let's figure out who those are.

14         MR. BLAVIN:  Yes.

15         THE COURT:  Are any of them here?

16         MR. PRESTON:  No, your Honor.

17         THE COURT:  None of them are here.

18         MR. PRESTON:  And I paid close attention to Rule

19    45 when I served those subpoenas, and the way the rule is

20    written, you have to have the place of production within 100

21    miles of -- okay.

22         THE COURT:  No, no, I know that.

23         MR. PRESTON:  Okay.  So we looked at their --

24    their headquarters.  All the subpoenas are served outside of

25    the state, outside of the -- even this District.

41

1          THE COURT:  Yeah.

2          MR. PRESTON:  And that -- that was vital to ensure

3    that we had viable subpoenas.

4          THE COURT:  But I just want to say just as a

5    practical matter, Mr. Preston, as a practical matter, we

6    could go through this exercise, and it may be that they're

7    going to claim they can't get them produced, and until we

8    actually get the vendors here, it may be hard to get the

9    documents.  In other words, it may be a pain to do that, but

10   at some point there actually is going to be a deadline for

11   filing class certification.  I'm not going to do it today

12   because you have this outstanding motion to dismiss which

13   obviously will impact the scope of that motion.  So I'm not

14   going to set a deadline today, but once that's done, we're

15   going to set a deadline, and that's going to be it, and

16   you're going to have to get stuff, and the fact that it will

17   take a year to get it this way, I guess what I'm saying is

18   you just might want to -- I mean, that's what people

19   sometimes have to do, right?

20          MR. PRESTON:  Sure.  I understand that.  The other

21   aspect that I want to raise with your Honor is if I have to

22   go through the route of the subpoena, there is going to be

23   claims for costs, and, well, the costs are -- that's a

24   different issue dealing with a subpoena than it is going

25   through the control route with the party.  And I can't --

42

1  because of the standing issue in the <u>Agne</u> (phonetic), you

2  know, I don't -- I can't sue those Defendants -- or not

3  Defendants.  They're never going to be Defendants.  The

4  other vendors will never be Defendants in this case.

5          THE COURT:  Uh-huh.  That's the law.  Okay.

6  That's the law.

7          MR. PRESTON:  Thank you, your Honor.  I understand

8  your opinion.

9          MR. BLAVIN:  And, your Honor --

10         THE COURT:  And I don't -- I don't -- I don't know

11 how I -- because of that, what -- so what inference do I

12 draw from it?  If that's what the law is, then that's what

13 the law is.

14         MR. PRESTON:  I would like your Honor to entertain

15 a dual track of, yeah, okay, let's go with -- through the

16 subpoenas, but I want to push just as hard on the control

17 issues.

18         THE COURT:  I'm not -- I'm not disagreeing with

19 that.

20         MR. PRESTON:  Okay.

21         THE COURT:  I'm not disagreeing with that, but

22 what I'm saying is when push gets to shove, if you let the

23 subpoena --

24         MR. PRESTON:  No, I've got --

25         THE COURT:  -- if you let the subpoena go, then

*Echo Reporting, Inc.*

43

1 you might find yourself just running out of time.

2 　　　　MR. PRESTON:  Right.  Prudence requires that I

3 push on all cylinders.

4 　　　　THE COURT:  Yeah.

5 　　　　MR. BLAVIN:  And, your Honor, I would say that I

6 believe all of the vendors' outside counsel but one has

7 offices in Northern California.  We will certainly -- and if

8 it's in the court order, even better -- raise this issue of

9 waiving the jurisdictional --

10 　　　　THE COURT:  It would be less expensive for them.

11 　　　　MR. BLAVIN:  I entirely agree.

12 　　　　THE COURT:  It would be --

13 　　　　MR. BLAVIN:  It --

14 　　　　THE COURT:  Yeah.

15 　　　　MR. BLAVIN:  It is much to our preference to have

16 this go through a subpoena route than having us -- having to

17 deal with the vendors in the context in which they refuse to

18 cooperate.  With a subpoena, they have to cooperate.  And,

19 as your Honor noted, they would then be within the

20 jurisdiction of the Court, and they would have to follow

21 court orders.  Right now if I go to them with a court order,

22 they say "That's nice.  We're not before the Court."

23 　　　　THE COURT:  Yeah.  No, it -- but it will be less

24 expensive for you.  It will be less expensive for them if

25 they would just consent.  They don't have to -- if they have

44

1  their objections, they can make them.

2          MR. BLAVIN:  Yes.

3          THE COURT:  But if they would just agree to do it

4  here in one proceeding, that would be best for everybody.

5          MR. PRESTON:  Is your Honor anticipating full

6  briefing or the letter brief on -- on the motions for the

7  subpoenas or are we not there yet?

8          THE COURT:  Well, we're not there yet.

9          MR. PRESTON:  Okay.

10         THE COURT:  I mean, not that I'm optimistic that

11  they're just going to give you all those documents, but so

12  let's -- so on June 19th you're going to provide them with

13  all the evidence as to --

14         MR. BLAVIN:  Yes.

15         THE COURT:  -- which vendors recorded the calls,

16  recorded the relevant calls --

17         MR. BLAVIN:  Right.

18         THE COURT:  -- and which did not?

19         MR. BLAVIN:  Yes.

20         THE COURT:  At that point, then what?  And then

21  what -- what do you propose, that you'll -- we -- you know,

22  don't you, what Mr. Preston is seeking?

23         MR. BLAVIN:  Yes, I do know what he's seeking.

24  What we would prefer at that point is that Mr. Preston

25  pursues his subpoenas that he served with respect to those

45

1  specific vendors, and that discovery goes forward.

2          THE COURT:  All right.  But what he's saying is at

3  the same time he wants to pursue, as is his right, his

4  argument that you have control over these documents vis-a-

5  vis those contracts, which is well established under the law

6  that those contracts can provide it.

7      And, again, I go back to the argument as to the

8  recordings.  Now, if the argument is proportionality, that's

9  different, but what I would need then if you're going to say

10 it's disproportionate because of the burden, is some

11 declaration that establishes what that burden is.

12         MR. BLAVIN:  And we are happy to supplement the

13 record with that evidentiary basis if your Honor is

14 requesting it, and we would be happy to do that, and we

15 would be happy to provide a more wholesome record with

16 respect to what the vendors say in response to any request

17 we may pursue into those audit --

18         THE COURT:  Well, I don't know if you're happy or

19 not.  I can't find that it's disproportionate without

20 something in the record that shows what that burden is.

21 Whether you're happy or unhappy, I just need some -- it has

22 to --

23         MR. BLAVIN:  And we're in a little bit of a bind

24 here because the vendors -- I mean, I can submit a

25 declaration saying I had a conversation with so and so and

46

1 they told me this, and this is what it said.  We've

2 repeatedly informed the Court with respect to the nature of

3 our communications with the vendors when they've pushed

4 back --

5          THE COURT:  You know what I want to know is that

6 Mr. Verizon called the -- I know --

7          MR. BLAVIN:  Well, that's why we --

8          THE COURT:  -- there's no Mr. Verizon.

9          MR. BLAVIN:  -- had Mr. Batinalli (phonetic) call,

10 because he actually was responsible for the commercial

11 relationship with those vendors, and we said "They're not

12 listening to the outside lawyers.  We'll have someone who's

13 actually responsible for the commercial relationship make a

14 call to his counterpart at those vendors," and that's what

15 he did.  And he said "We have this order from the Court for

16 you to participate in this conference.  Please do so."

17          THE COURT:  All right.  So I want you to do that

18 by June 19th.  I want you to have the conversation with

19 those vendors and --

20          MR. BLAVIN:  Yes.

21          THE COURT:  -- say "I understand that you have a

22 dispute as to whether you should be required to produce

23 these documents.  Would you consent to" --

24          MR. BLAVIN:  Yes.

25          THE COURT:  -- "having that dispute resolved in

47

1 the Northern District" --

2          MR. BLAVIN:  Yes.

3          THE COURT:  -- "of California?"

4          MR. BLAVIN:  We will, your Honor.

5          MR. PRESTON:  I have to object strenuously to

6 supplementing the record at this point.  I don't know why

7 I'm here and why the parties should go through all of this

8 trouble and difficulty of preparing a record for a motion

9 and to come out before the Court if the other party gets to

10 kind of change the record as we go along.

11          THE COURT:  It's not changing the record.  We're

12 now dealing with the -- this motion had to do, a lot of it,

13 with the TCPA claims.

14          MR. PRESTON:  They overlap.

15          THE COURT:  But not the IPA.  All right.  This is

16 the way we're doing it.  It's not a matter of supplementing

17 the record.

18      Mr. Preston, you are seeking a lot of documents and

19 evidence and things that is costly, and I'm going to look at

20 that.  It's not that you're just entitled to it as a matter

21 of right.  Should they -- sure, Verizon has been dilatory.

22 No question about it.  They should have produced that just

23 like they should have produced the privilege logs, and they

24 will have to pay some money for you having to bring this

25 motion because there's absolutely no excuse for their

1  failure to have produced a privilege log over all this time.

2  All right.  I understand that.

3      But now -- but I'm not just going to say order them go

4  ahead, produce these documents, which I know they're not

5  going to do and -- because they have those third party

6  custodians.  So we want to do it in a practical matter.

7            MR. PRESTON:  Well, look, if we're introducing

8  evidence from the third parties that are not -- I can

9  understand that, but there's nothing from Verizon.

10           MR. BLAVIN:  Well, I don't know if you want me to

11 address that, your Honor, or --

12           THE COURT:  Well, the only thing is Verizon has

13 said they asked for it, and they couldn't get it.

14           MR. BLAVIN:  And we do have evidence in the record

15 with respect to what it's cost Collecto to extract that

16 information, and we're not getting information from the

17 vendors, but, you know, it's 70, 80 thousand dollars, and

18 you can extrapolate that to what it might cost the vendors.

19           THE COURT:  I don't know because I don't know how

20 many calls it is or anything like that.  I don't know what

21 the volume is or any of that.  So figure out who the vendors

22 are, all right.

23           MR. BLAVIN:  Uh-huh.

24           THE COURT:  And you talk to them.  You know what

25 the requests are.  Maybe there's a way of actually getting

49

1  it done and avoiding all this costly motion practice, all

2  right.

3          MR. BLAVIN:  We will do --

4          THE COURT:  Like the recordings, just identify the

5  -- I don't know what that involves because you haven't put

6  anything in front of me.  If they're not going to agree to

7  produce any of this, including the recordings and the call

8  detail records, that's what you want, right, essentially?

9          MR. PRESTON:  For the IPA, I would be happy with

10 just the recordings, but I really need to see the RF's to

11 know what the number was called, but if -- they're not going

12 to be able to find the recordings without the CDR's I don't

13 think.

14         THE COURT:  And then see if they would agree to

15 resolve that here.

16         MR. PRESTON:  Yes.

17         THE COURT:  And then let's do -- if they won't,

18 let's do a call and figure out then how we're going to

19 resolve that, and we may, as Mr. Preston said, do it on a

20 dual track.  I'll decide if you have custody and control,

21 and if you won't do it, I'll find you in contempt, whatever.

22 But I'm the one that gets you if he doesn't get you the

23 documents.  And then --

24         MR. PRESTON:  And I'm going to have to worry about

25 a deadline, and I'm --

1          THE COURT:  Yeah.

2          MR. PRESTON:  I'm --

3          THE COURT:  And then but maybe they will or -- and

4    then we can resolve it here, which they really should.  It

5    would just be much less expensive.

6          MR. BLAVIN:  I agree.  I agree.

7          THE COURT:  So that's what we'll do on those

8    documents.  All right.

9       So let's go to the sanctions motion then.  So one

10   argument is that -- and I'm not sure if it's Collecto or

11   Verizon -- should be sanctioned for concealing the Powell

12   case.

13         MR. PRESTON:  It's -- that's right.  That's --

14         THE COURT:  And I guess how did you learn of the

15   Powell case because you learned of it?

16         MR. PRESTON:  Before I answer that question, is it

17   your Honor's position that answering the question would

18   waive work product?

19         THE COURT:  No.  All I'm trying to find out is was

20   the concealment -- was it -- if they didn't answer but there

21   wasn't any prejudice because you found out about it, then --

22         MR. PRESTON:  Oh.

23         THE COURT:  -- what's the sanction?  What's the

24   sanction?

25         MR. PRESTON:  Sure.  The -- I don't remember when

51

1  we found it.  We found it on PACER.  So the prejudice is

2  that they effectively concealed the fact that if you look at

3  the Powell record, there's pleadings in there which talk

4  about, "Oh, we've got these call logs," and we know we need

5  to preserve call logs because that's how you identify wrong

6  numbers.  And had we known that, we would have rebutted a

7  whole ton of -- we could have avoided a whole ton of

8  discovery that we didn't need to take and was ultimately not

9  the most efficient way to identify wrong numbers.  We could

10 have avoided a whole -- I mean, we were told several times

11 throughout 2013, "Oh, we don't have call logs."  If we had

12 known about the Powell case, we'd have said "No, what about

13 Powell?"

14          THE COURT:  Okay.

15          MR. PRESTON:  "You absolutely knew you do have

16 call logs."

17          THE COURT:  All right.  So, Mr. Messer, is there

18 anything in the record -- is there any evidence in the

19 record as opposed to attorney argument as to why the

20 interrogatory answer in this question with respect to other

21 cases involving wrong numbers was not an accurate response?

22          MR. MESSER:  I don't think that -- the only thing

23 I think is in there is a response which was a list of cases

24 produced by the company that involved prior TCPA case, and

25 that Powell was omitted from that list.

52

1          THE COURT:  All right.  So there's nothing in the

2  record that's why it was omitted?

3          MR. MESSER:  Other than -- that's right.

4          THE COURT:  Okay.  All right.  So then why -- why

5  isn't Mr. Preston right then?  I mean, why can't -- if

6  there's nothing in there that -- it just sounds like it was

7  -- I mean, it's right -- it's a case that was right on

8  point.  What should be the consequence from that?

9          MR. MESSER:  Impossible to tell on this record.

10  He says there was a lot of useless discovery.  Hard to say.

11          THE COURT:  Okay.

12          MR. MESSER:  So is -- on this record it's

13  impossible to say what the sanctions should be, if any.  I

14  mean, I think there should be a -- as I said in my papers, I

15  think, you know, we can produce a witness.  We can do that.

16  I mean --

17          THE COURT:  It's too --

18          MR. MESSER:  -- my -- my understanding is that the

19  Powell case was -- was that they used a code to compile this

20  list of TCPA cases and that TCPA was omitted from the Powell

21  code.

22          THE COURT:  Well, no, don't tell me your

23  understanding if it's not in the record.

24          MR. MESSER:  It's not in the record, your Honor.

25  It's not.

53

1          THE COURT:  Then it's too late.

2          MR. MESSER:  Right.  I understand that.  I

3   understand that.  But -- but my point is is that all this --

4   all these arguments about Powell is so devastating is

5   entirely speculative on this record.  We're in the middle of

6   discovery, and -- and there's no tangible showing of -- of

7   actual prejudice that would allow the Court to fashion a

8   reasonable sanction because I think --

9          THE COURT:  Okay.

10          MR. MESSER:  -- they're just guessing.

11          THE COURT:  All right.  All right.  What do you

12   think the sanctions should be?

13          MR. MESSER:  I think they should pay attorney fees

14   from the point at which they concealed Powell because we

15   would have greatly circumvented a ton of work, a ton of

16   expenses.  We would never have dealt even with the account

17   notes.  We wouldn't have even gotten into the account notes

18   where we spent, you know, probably at least 100 attorney

19   hours, if I guess, and, you know, tens --

20          THE COURT:  So is the representation that Powell

21   is what alerted you to the fact that call detail records

22   exist?

23          MR. MESSER:  Ultimately, Powell -- and I -- you

24   know, your Honor, I -- you're going to have to forgive me

25   because I don't remember which I learned first.  It's either

54

1 Powell or our expert, Mr. Schneider, told us "Look, all

2 these vendors have call detail records.  They all have call

3 logs.  There's on reason why they should have withheld the

4 call logs."  And we -- we engaged Mr. Schneider in the

5 summer of 2014?  Yeah, you're putting me on the spot.  I did

6 not anticipate that this was going to be the focus of that

7 motion.

8          THE COURT:  Well, you moved.

9          MR. MESSER:  I -- I did, but I didn't quite

10 understand where your Honor intended to go.

11          THE COURT:  I just intend to resolve the motion.

12 All right.  So I understand about that.

13     Now, you also are requesting sanctions with respect to

14 the destruction of certain call detail records, and I guess

15 the -- Collecto, we're just talking about Collecto here.

16          MR. MESSER:  Right.

17          THE COURT:  Collecto destroyed the call detail

18 records up until September 2014.

19          MR. MESSER:  There is a -- there are three places

20 where these records are stored, the FAT system, the archive,

21 and the Dial-a-Record," and there was a period of time when

22 the Dial-A-Records were systematically deleted if they're

23 more than two years old, and that was from -- because the --

24 that hole, we though the -- all the records were being

25 stored.  Turned out some details were not.

1    That period of time is November of '11 through

2  September of '12, but it's entirely immaterial because we

3  have been able and we filed the declaration of our expert,

4  Aaron Wolfson, with our opposition that said that from the

5  records that have been produced, we can identify every call

6  made by Collecto during the class period on Verizon Wireless

7  accounts to non-Verizon Wireless cell phone numbers.

8         THE COURT:  So why shouldn't Mr. Wolfson then go

9  over to Plaintiffs' office or wherever it be and do it?

10 Show up and do it?

11        MR. MESSER:  Well, you know, and, your Honor, this

12 has been the invitation forever.  That's why we were here on

13 January 15 to do that, and that offer remained open, and in

14 response to our -- Mr. Wolfson's declaration in our

15 opposition saying he could do that, I did not get a call

16 from Plaintiffs' counsel.  Instead I got a reply brief

17 saying "This is entirely speculative and this is nonsense,

18 and it shouldn't be" --

19        THE COURT:  All right.  So you say, yeah, he could

20 do that, he could certainly do that.

21        MR. MESSER:  And -- and the Plaintiffs could have

22 learned how to do this months ago if --

23        THE COURT:  No, I don't care about that.  So why

24 isn't that the right response?  They say all this missing

25 information can be gleaned.  Mr. Wolfson will happily do it

56

1  for you.

2          MR. MESSER:  Our experience with the involuntary -

3  - or the -- involuntary, what a Freudian slip.  Our

4  experience with the informal meet and confer process, trying

5  to discover how things were done, they have their view, and,

6  unfortunately, there's not a clean record.  We have our own.

7  We've asked for all sorts of things about how to reconstruct

8  these records on our own that we've not gotten.

9      Now, we have gotten invitations to have your expert and

10 our expert -- we'll fly them all out at -- you know,

11 everybody's on the coin, and we'll talk about how I did what

12 I did, and Mr. Schneider I think correctly said "Look, these

13 dialers have their own systems for producing call logs.

14 Let's use the built-in inherent functions of these dialers

15 to produce a record for class certification."  If you have

16 the CDR's, you don't need to mess with the import files and

17 then cross-compare them against the -- the account notes I

18 believe is how he did it.  There is a very limited space for

19 which we really want -- that we need a reconstructive call

20 log.  It is --

21          THE COURT:  That's all you're offering for that

22 limited space, right, is November '11 to September '12?

23          MR. MESSER:  No.  I -- Mr. Wolfson prepared a

24 report that I produced yesterday pursuant to Rule 26 and

25 filed, and there's an objection to that, but -- but we have

57

1  counted the actual number of non-Verizon wireless cell

2  phones called by Collecto during the four-year class period.

3  We can identify every single one of them, and we have

4  counted the number of recordings.  And so, ultimately, you

5  know, the class is non-Verizon Wireless customers who were

6  called.

7       Well, we know that the Plaintiffs' lawyers are -- want

8  to focus on this wrong number code, but we've always said

9  throughout the litigation that wrong number codes are

10  unreliable.  For example, when you --

11           THE COURT:  Right, but -- I understand that.

12  That's your opposition to class cert arguments.

13           MR. MESSER:  Well --

14           THE COURT:  So the question is they don't want

15  you, for whatever reason, except for that period, that one-

16  year period, rely on Mr. Wolfson's extraction of the record.

17  They want the call detail records.  Why can't they have

18  those for those that have not been destroyed?

19           MR. MESSER:  Those were produced on April 13th.

20           THE COURT:  Okay.  You have them then.  So then

21  what's missing?

22           MR. PRESTON:  Can you provide a Bates Stamped --

23           MR. MESSER:  I can.

24           MR. PRESTON:  Okay.  Please do for the record.

25           MR. MESSER:  I can read it into the record now.

58

1        MR. PRESTON:  Okay.  Great.  These are the CDR's

2  for what exactly?

3        MR. MESSER:  These are Nobel call recording.  It's

4  Nobel metadata.

5        MR. PRESTON:  You're talking about the U and L

6  files?

7        MR. MESSER:  U and L files.

8        MR. PRESTON:  Okay.  But those aren't -- those are

9  the archives that's the metadata for the recordings.  It's

10 not the CDR's themselves.  That's a different set of

11 documents.

12       MR. MESSER:  Well, let's talk about that.  We have

13 a log.  We have -- we do have the archives that we produced.

14       MR. PRESTON:  And -- and those are nice, but they

15 are problematic -- I think they're problematic because they

16 don't capture calls that are not answered or recorded, and

17 so you're going to be missing some TCPA claims from those.

18 And what you provided actually is, if I'm not mistaken, a

19 sample, not -- not all the CDR's that we've asked for.

20       THE COURT:  Well, I -- so we've gone through the

21 motion to compel.  I'm just doing the motion for sanctions

22 at this point, right?

23       MR. MESSER:  Right.

24       MR. PRESTON:  And this -- this is a separate --

25 there's a separate discovery, and they've objected to

59

1  producing the CDR's.

2          THE COURT:  Okay.  And so we're not there yet is

3  what you're saying?

4          MR. PRESTON:  No, we're not there yet.

5          THE COURT:  Okay.  All right.  Well, then that's

6  that.

7      With respect to where they can't produce CDR's because

8  they don't exist because they've been destroyed and Mr.

9  Wolfson says they can be recreated, you say --

10          MR. PRESTON:  And there's problems that have gone

11  unaddressed that -- in these CDR's, all the CDR's have a

12  call disposition code or a call result code, and we went

13  through using our own kind of automated analysis, and there

14  are something like almost 3,000,000 calls from Nobel dialer

15  where that call -- call result code is missing, and it's

16  never been explained, and it's never been justified, and it

17  would be there if it were genuine authentic original CDR,

18  and there's nothing on the record that explains that.  I

19  think there's a similar problem with the sound bite file.

20  Something like 20,000,000 call records don't have data in

21  the field where you contain a wrong number code.  The call

22  result field is -- is missing.  It's null, and if you look

23  at the -- my declaration where there's some -- we had

24  recorded conferences with Mr. Wolfson.  Mr. Wolfson said

25  that is a situation in which the original data is just

1  missing.  It would have been in the original files.  I don't
2  have it, and there's not a good explanation for why it's not
3  in the reconstructed call logs.

4          THE COURT:  Okay.  What do you want me to do?  Is
5  this issue in front of me?

6          MR. PRESTON:  Yeah, because -- because we have for
7  a period of I think it's 14 months a set of reconstructed
8  call logs that don't contain data that would indicate
9  whether or not somebody's in the class or not.

10         THE COURT:  But I thought Mr. Messer says it does.

11         MR. PRESTON:  It does.  Look, there are -- there's
12 more than one way to get to these so-called wrong number
13 codes.

14         THE COURT:  Okay.  So this is what I'm going to --
15 this is what I'm going to do.  I'm going to order -- and
16 it's not going to be invited.  I'm going to order Mr.
17 Wolfson at -- at Defendants' expense to go and sit down,
18 whether it be with you or Mr. Schneider or whoever, and do
19 it, reconstruct it and show it.  And then --

20         MR. MESSER:  Very good, your Honor.

21         THE COURT:  You know, do it instead of us
22 speculating or guessing whether he can do it or not.  Just
23 do it.  Just show him.  All right.

24     So I think was there more with respect to the
25 sanctions?

61

1           MR. PRESTON:  There is the spoliation.

2           THE COURT:  But that's what we're talking about.

3  I know.  I'm listing things off.

4           THE COURT:  Okay.

5           MR. PRESTON:  Spoliation.  There's the concealment

6  of Powell.  There's the interference with the subpoenas to

7  the --

8           THE COURT:  Yeah, there is in evidence that they

9  interfered.  So --

10          MR. PRESTON:  Your Honor, the -- the Yee

11 declaration -- it's mislabeled as the Mao declaration --

12 says we -- we received communications from Verizon saying

13 you -- you know, you should not respond to these subpoenas.

14          MR. BLAVIN:  Your Honor, the -- the Mao

15 declaration states -- which is quoted in the -- in the

16 motion papers, is that VKI was informed that Verizon is

17 claiming that whatever responsive information in the

18 possession of VKI is not controlled or owned by Verizon and

19 said belonged to third parties.  That's Verizon's objection.

20 There's no evidence whatsoever that Verizon instructed VKI

21 to assert that objection.  It doesn't even make sense.  VKI

22 could assert whatever objections it wanted to.  There's

23 absolutely nothing in the record to support that Verizon was

24 instructing its vendors to assert particular objections, and

25 that's all the record has is that -- that statement from the

62

1  VKI declaration.  It does not support this allegation.

2          MR. PRESTON:  Well, I -- I think there is evidence

3  that certainly Verizon knew about objections well before we

4  did and --

5          THE COURT:  So what?  That's always the case.

6          MR. PRESTON:  I think Price v. Trans Union is

7  really clear they don't get to go into a witness and say

8  "Don't comply with this subpoena."

9          MR. BLAVIN:  There's no --

10         THE COURT:  And what is the evidence that that's

11 what they did?  Give me the -- the docket number?

12         MR. PRESTON:  The Yee declaration, I'm sorry, but

13 there's no other way to read that other than Verizon saying

14 this is why you shouldn't comply with the subpoena and then

15 the next thing is they file a motion to quash.

16         THE COURT:  What -- what exhibit is it?  Where

17 is --

18         MR. PRESTON:  Yee --

19         MR. BLAVIN:  It's DEF Number 63.

20         MR. PRESTON:  Yeah --

21         MR. BLAVIN:  Paragraph three.

22         MR. PRESTON:  -- point one.  And it is the --

23         THE COURT:  Oh, I don't think I have it here.

24         MR. PRESTON:  And it is the Yee declaration.  It's

25 mislabeled as the Mao declaration.

1          THE COURT:  Sixty-three point one.  Well, what was

2  just read to me doesn't say that.  Is there something more

3  there?

4          MR. PRESTON:  Verizon did not initially file any

5  objections to either VKI or Plaintiff.  However, sometime in

6  October 2014, counsel for VKI was informed that Verizon is

7  claiming that whatever is responsive information in the

8  possession of VKI was not controlled or owned by Verizon but

9  instead belonged to third parties.

10      In the context of a motion to quash -- and that is the

11  justification, and it's -- if you read in context of that

12  declaration, it's very clear that that is the reason why

13  they brought the motion to quash.

14          THE COURT:  Actually, one way of reading that is

15  to say don't object to this on the ground that -- that you

16  should be getting the documents from Verizon, which is often

17  what you see.  In fact, the most -- most common objection to

18  a subpoena is "Why are you bringing me in here?  You should

19  be going to the Defendant, who's the party to the case."

20  And so that actually could be read to say -- could say

21  "Don't make that objection.  These aren't our documents.

22  These are your documents."

23          MR. BLAVIN:  And, your Honor, that's consistent

24  obviously with the position we've been taking in the

25  litigation.

64

1          MR. PRESTON:  But that -- that's not actually

2     consistent because these are documents that they -- Verizon

3     disclaims any control over.

4          THE COURT:  Yes.

5          MR. PRESTON:  And they're very clearly documents

6     in VKI's system.  VKI can't possibly be saying "Oh, these --

7     we don't own these documents" or --

8          THE COURT:  Okay.  Well, I don't read it that way,

9     Mr. Preston.  That's not evidence to find that, which is a

10    pretty serious allegation.  I can't find it based on that if

11    that's all there is.

12         MR. PRESTON:  Well, your Honor is the -- on that

13    side of the bench.

14         THE COURT:  So is there anything else that we

15    should discuss in the sanctions motion?  I'll issue a

16    written order on all this.

17         MR. PRESTON:  Well, I mean, look at the --

18         THE COURT:  But the June 19th date --

19         MR. MESSER:  Yes.

20         THE COURT:  -- you've got that.  Don't --

21         MR. MESSER:  We have that, your Honor.

22         THE COURT:  Don't wait, right.

23         MR. MESSER:  Yes.

24         THE COURT:  In fact, those privilege logs should

25    already be done.

1          MR. PRESTON:  I -- you know, look, there's this

2   long history of they made mis -- I don't -- they made plenty

3   of misrepresentations that they could not have located class

4   members in any other way than what they did, which is to --

5   the account notes, the ELS 491 to 95, and that just wasn't

6   true.  They could have done call logs at any time, and

7   instead they gave us this, you know, two -- there were two

8   gigabytes of documents that were impossible to parse, and

9   that caused us -- I'm sorry to say, it cost us at least

10  $10,000, and our -- our expert had to write off quite a bit

11  more.

12          THE COURT:  Well, let me ask you this, Mr. Messer

13  or Blavin, or --

14          MR. MESSER:  Sure.

15          THE COURT:  -- whoever wants to speak.  I mean,

16  this does seem to be the overriding issue for the Plaintiff,

17  which is when did you disclose the existence of the call

18  detail records?

19          MR. MESSER:  Well, call records were not requested

20  in discovery until March of 2015.  The issue arose in 2014,

21  and so I don't recall the exact date, but it was in informal

22  discussions about other document requests.  Certainly in the

23  context of the IPA case, you know, up until November 2013,

24  we never had a discussion about any call detail record.

25          THE COURT:  Let me -- let me --

1          MR. MESSER:  And also on 491 to 495, the -- the

2    production that the Plaintiffs claim was so obstructive, you

3    know, we filed a declaration of Ryan Grimes who was the

4    consultant who put that together, and he was trying to be

5    thorough and trying to include everything, and -- and it's

6    all well and good to say "Well, Collecto could have produced

7    it in a more usable form," but that ended up costing the

8    company about $30,000.

9          THE COURT:  So this is what I want to know because

10   I've kept Ms. Means here longer than she's supposed to be

11   here, and she doesn't get paid overtime.  What -- what are

12   the pages of your brief, Mr. Preston, that focuses on this

13   issue, that their failure to disclose the call detail

14   records --

15         MR. PRESTON:  That starts with -- on the reply

16   brief it's page six through seven, and on the opening brief

17   it's pages four to eight.

18         THE COURT:  Okay.  And are there pages in your

19   opposition, Mr. Messer, that you want to point out?

20         MR. PRESTON:  Before I let that go, I want to be

21   clear in the reply brief we do talk about there was a --

22   there was a subpoena served on Collecto in early August 2012

23   where we asked for call logs, and they said "No, we don't

24   have any call logs."  There was a declaration again provided

25   by John Burns in April 2013 which said in effect there are

67

1   no call logs.  We've gotten --

2           THE COURT:  Is that in your -- is that in your

3   papers?

4           MR. PRESTON:  It's in the reply brief.

5           THE COURT:  Okay.  Then I'll read that there.

6           MR. MESSER:  And those reports just aren't there.

7   They're just not there.

8           THE COURT:  I'll read them.

9           MR. MESSER:  In the opposition on this topic is

10  pages three through eleven of the opposition.

11          THE COURT:  Okay.  All right.  I'll read it, and

12  I'm going to rely on the record --

13          MR. MESSER:  Very good.

14          THE COURT:  -- that the parties have made because

15  they had plenty of time to make it.

16          MR. MESSER:  Sure.

17          THE COURT:  So I'm going to issue a written order.

18  In that written order I'm going to set the date for us to

19  come back on these IPA claims and these vendor claims and

20  get that moving.

21          MR. MESSER:  Okay.

22          THE COURT:  Mr. Blavin, I really want you to get

23  them to agree that any objections should be resolved here,

24  because we will be dual tracking it then, and that's going

25  to be expensive for Verizon, and I think Verizon has the

68

1  ability to tell its vendors -- well, its vendors is paying

2  for it anyway.  So it's kind of all circular.  But in any

3  event -- but in the meantime, don't wait for my order.  You

4  have the ruling.  On June 19th you have to produce all that

5  stuff that we discussed today.

6              MR. BLAVIN:  And we'll do that.

7              THE COURT:  Okay.  All right.

8              MR. PRESTON:  Now, we have -- I'm sorry, your

9  Honor.  We have outstanding RPD 64.  If you'd like to take

10 it up on a telephonic conference, that's fine.

11             THE COURT:  Where is that?

12             MR. PRESTON:  That's in the motion to compel.  It

13 is the -- I thought we were going to deal with it later on.

14 You know, we've got this issue -- we've got the deposition

15 issues where Mr. Cappola was not able to explain why 491 to

16 495 was formatted the way it was, and then we find out in an

17 opposition that Mr. Grimes decided that was a good way to do

18 it.

19     We've also got the violation of your Honor's February

20 9th order.

21             THE COURT:  Yeah, I can address that.  I'll

22 address that.

23             MR. PRESTON:  That's fine.

24             THE COURT:  That's the joint -- let's see.  Oh,

25 the documents concerning any communications regarding this

1  case between Verizon and any person, excluding Plaintiff,

2  and Verizon's communications with third parties about this

3  case.  "Verizon agreed to produce some responsive

4  documents."

5       When are you -- June 19th, right?  You agreed to

6  produce some responsive documents?  And I think part of the

7  issue is you didn't say when.

8            MR. MESSER:  With respect to Collecto, yes, and

9  with respect to --

10           THE COURT:  Okay.  So by --

11           MR. MESSER:  -- the other --

12           THE COURT:  -- June 19th.

13           MR. MESSER:  -- other parties, I'm not sure we've

14  addressed that.

15           MR. PRESTON:  The key issue here is we think

16  there's been some -- obviously, we think there's been some

17  shenanigans with discovery.  People are playing footsie

18  with, you know, control issues and all sorts of discovery

19  with respect to the other vendors.  There's never been a

20  privilege log produced.  They rely on --

21           THE COURT:  Right, but the other vendors with

22  respect to the TCPA claim that is on hold.

23           MR. PRESTON:  And that's fine, but then you've

24  still got Vantage and VKI which are actually the two biggest

25  ones with respect to this kind of interference.

70

1          THE COURT:  Vantage, we have them because they're

2   on the privacy claim?

3          MR. PRESTON:  Yeah.  My understanding is those two

4   vendors did, in fact, have recording practices that complied

5   with Verizon's recording practices.

6          THE COURT:  Okay.  Well, that's what -- that's

7   what we're going to figure out.  That's what we're going to

8   figure out.  So, yeah, you're right.  We'll address that in

9   connection with that then.

10          MR. PRESTON:  Okay.

11          THE COURT:  Okay.  Thank you very much.

12          ALL:  Thank you, your Honor.

13      (Proceedings adjourned at 4:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

71

CERTIFICATE OF TRANSCRIBER

1

2

3     I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9     I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16         Echo Reporting, Inc., Transcriber

17            Tuesday, June 9, 2015

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*